

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: December 20, 2019**

The Order of the Court is set forth below. The docket reflects the date entered.

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **JOSEPH PATRICK FRASCOGNA AND LISA N. FRASCOGNA,** | **CASE NO. 11-03822-NPO** |
| **DEBTORS.** | **CHAPTER 7** |
| **BEHER HOLDINGS TRUST** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 18-00128-NPO** |
| **JOSEPH FRASCOGNA** | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER ON COMPLAINT OBJECTING TO DISCHARGE AND TO DETERMINE DISCHARGEABILITY OF DEBT

This matter came before the Court for trial on November 6, 2019 (the "Trial"), on the

Complaint Objecting to Discharge and to Determine Dischargeability of Debt (the "Complaint")

(Adv. Dkt. 1)[1] filed by Beher Holdings Trust (the "BHT") and the Answer and Defenses to

---

[1] Citations to docket entries in the above-referenced adversary proceeding (the "Adversary Proceeding") are "(Adv. Dkt. #); and citations to docket entries in the above-referenced bankruptcy case (the "Bankruptcy Case") are "(Bankr. Dkt. #).

Complaint Objecting to Discharge and to Determine Dischargeability of Debt (the "Answer") (Adv. Dkt. 7) filed by Joseph Frascogna ("Frascogna") in the Adversary Proceeding. The Pretrial Order (the "PTO") (Adv. Dkt. 24) was entered on October 24, 2019. At Trial, Daniel D. Ware represented Frascogna and Jeffery D. Rawlings ("Rawlings") represented BHT. During the Trial, BHT introduced into evidence ten (10) exhibits and Frascogna introduced six (6) exhibits.[2] The issues put forth by the parties for Trial included: (1) whether Frascogna breached a contract or breached a fiduciary duty entitling BHT to damages in the amount of $9,826,585.00; (2) whether BHT properly designated Dr. Charles C. Edwards ("Dr. Edwards")[3] as an expert in damages; (3) whether BHT's cause of action against Frascogna accrued after November 2, 2011, the date of Frascogna's bankruptcy filing; (4) whether the actions of Frascogna constituted fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny so as to except from discharge any debt owed to BHT pursuant to 11 U.S.C. § 523(a)(4); and (5) whether the actions of Frascogna constituted willful and malicious injury to BHT so as to except from discharge any debt owed to BHT pursuant to 11 U.S.C. § 523(a)(6). (PTO at 12). The Court, having considered the pleadings, evidence, and arguments of counsel, finds as follows:[4]

---

[2] The exhibits introduced into evidence at Trial by BHT are cited as "(BHT's Ex. #). The exhibits introduced into evidence at Trial by Frascogna are cited as "(Frascogna's Ex. #).

[3] BHT did not send a representative to the Trial aside from Dr. Edwards. Dr. Edwards is the U.S. investment advisor for BHT and the original settlor. (Test. of Edwards at 10:04:38 10:04:50). At times during the events in question, Dr. Edwards acted as a representative for BHT, but, at times, Dr. Edwards also acted in his individual capacity. When referring to Dr. Edwards throughout, the Court will be referring to him in both his role as an individual and as BHT's representative, unless the context indicates otherwise.

[4] These findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Jurisdiction

This Court has jurisdiction over the subject matter of and the parties to this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A) and (I). Notice of the Trial was proper under the circumstances.

## Evidentiary Ruling

**Interrogatory Response**

At the Trial, Frascogna offered into evidence the Responses of William D. Dickson to Defendant's Second Set of Interrogatories (the "Interrogatory Response") (Frascogna's Ex. ID Only) that William D. Dickson ("Dickson") served on Frascogna in a prior action filed in the U.S. District Court for the Southern District of Mississippi (the "District Court") in *Beher Holdings Trust v. Frascogna v. Dickson*, No. 3:15cv7-HTW-LRA (S.D. Miss. Jan. 5, 2015) (the "District Court Action").[5] BHT objected to the Interrogatory Response on the basis of hearsay. The Court marked this exhibit for identification purposes and took the matter of admissibility under advisement. Before the Court can make findings of fact, the Court must resolve the admissibility issue.

Rule 9017 of the Federal Rules of Bankruptcy Procedure applies the Federal Rules of Evidence to proceedings under the Bankruptcy Code. FED. R. BANKR. P. 9017. As a preliminary matter, the Court considers whether the evidence proffered by Frascogna was relevant to the Adversary Proceeding. "To be admissible evidence must be relevant, and the resolution of the question of relevance is in the province of the presiding judge." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 629 F.2d 993, 999 (5th Cir. 1980). "Evidence is relevant if: (a) it has any

---

[5] The District Court administratively closed the District Court Action on February 15, 2018 (No. 3:15cv7-HTW-LRA, Dkt. 42) "until such time as the Bankruptcy Court has concluded its proceedings, or until such time as any of the parties request that this matter be reopened."

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

Frascogna attempted to introduce the Interrogatory Response into evidence to prove that Dickson removed certain loan documents from his office building prior to November 2, 2011, the date that Frascogna and his spouse commenced the Bankruptcy Case. Interrogatory Response provides, in pertinent part:

**INTERROGATORY NO. 16:**   Please state whether or not you removed the Blue World Pools documents referenced in Plaintiffs Complaint from your office building located at 234 East Capitol Street, 2nd Floor, Jackson, Mississippi 39201 prior to November 2, 2011.

**RESPONSE:** Yes.

Because the date is important in determining whether BHT's alleged claims accrued pre-petition or post-petition and, thus, whether BHT's alleged claims were discharged in the Bankruptcy Case, regardless of any exception to discharge that might otherwise apply, the Court finds that the Interrogatory Response is relevant to the Adversary Proceeding.

"Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court." FED. R. EVID. 402. BHT objected to the Interrogatory Response as inadmissible hearsay. "'Hearsay' means a statement[6] that: (1) the declarant[7] does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). "Hearsay is not admissible unless any of the following provides

---

[6] "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FED. R. EVID. 801(a).

[7] "'Declarant' means the person who made the statement." FED. R. EVID. 801(b).

otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." FED. R. EVID. 802.

The Court finds that the Interrogatory Response is hearsay within the meaning of Federal Rule of Evidence 801. Dickson, the declarant of the Interrogatory Response, was not a party in the Adversary Proceeding and did not testify at the Trial. Moreover, the Interrogatory Response was offered to prove the truth of the matter asserted—that Dickson removed certain documents from his office building prior to November 2, 2011.[8] Further, the Court finds that the Interrogatory Response does not qualify for any of the exceptions to the rule against hearsay delineated in Rules 803 and 804 of the Federal Rules of Evidence. *See* FED. R. EVID. 803, 804. The Court, therefore, sustains BHT's objection to the Interrogatory Response as inadmissible hearsay, and the Court will not consider the Interrogatory Response in its findings of fact.

## Facts

The parties have stipulated to the findings of fact related to the matters before the Court contained in the Memorandum Opinion and Order on Third Amended Complaint in Adversary Proceeding 12-00091-NPO; Consolidated Amended Complaint in Adversary Proceeding 12-00104-NPO; Amended Complaint for Turnover, Recovery of Property Transferred Post-Petition, Damages, Declaratory Relief, Equitable Subordination, and Other Relief in Adversary Proceeding 15-00080-NPO; and Consolidated Contested Matters, *Johnson v. Edwards Family Partnership, LP* (*In re Community Home Financial Services, Inc.*), 583 B.R. 1 (Bankr. S.D. Miss. 2018), *appeal pending* 3:18-cv-00158-CWR-LRA (S.D. Miss. 2018). Additional facts were adduced at the Trial.

---

[8] The Court notes that the Interrogatory Response does not fit within the scope of Federal Rule of Evidence 801(d)(1) or 801(d)(2).

A.      **Dickson's and Dr. Edward's Early Business Relationship**

Community Home Financial Services, Inc. ("CHFS") is a mortgage servicing entity that for the most part purchased mortgage loan portfolios at a discount from various third parties and serviced those loans. *Johnson*, 583 B.R. at 18. Dickson was CHFS's chief executive officer and its owner. Until the fall of 2013, CHFS's principal place of business was located in an office building owned by Dickson located at 234 East Capitol Street, in Jackson, Mississippi ("Dickson's Building"), where CHFS serviced mortgage loan portfolios, each one consisting of hundreds of individual notes secured by mostly subordinate residential mortgages on property located in over thirty (30) states in the United States.

In 2006, near the end of CHFS's relationship with its lender at the time, Roy Al Finance and Loan Company ("Roy Al Finance"), Dickson began searching for replacement financing. A business broker hired by Dickson brought a loan proposal to Dr. Edwards, an orthopedic surgeon from Baltimore, Maryland, whereby Dr. Edwards would replace Roy Al Finance as CHFS's lender. *Johnson*, 583 B.R. at 18.

After having Dickson over to his home for dinner in Baltimore, Dr. Edwards decided to go into business with him. (Test. of Dr. Edwards at 10:05:50-10:06:15). From September 25, 2006, to August 10, 2010, Dr. Edwards loaned approximately $16 million to CHFS. Dr. Edwards acted through four (4) entities owned and/or purportedly controlled by him, including BHT, a trust that he created under Bermuda law for the benefit of his children, and the Rainbow Group, Ltd. (the "Rainbow Group"). *Johnson*, 583 B.R. at 19. Dr. Edwards testified they had a "successful business relationship" and that he considered Dickson "somewhat of a friend." (Test. of Dr. Edwards at 10:06:00-10:06:16). During those initial years, Dr. Edwards was "unaware" of

Dickson's "unfortunate business dealings in the past." Dr. Edwards "faults himself" for not knowing about Dickson's "very checkered past." (Test. of Dr. Edwards at 10:06:15-10:07:03).

## B.    Rainbow Group

At the beginning of their business relationship, Dr. Edwards sent a letter to Dickson outlining the terms and conditions under which the Rainbow Group would offer CHFS a revolving line of credit up to $10 million to replace CHFS's existing credit facility and provide capital for the purchase of additional home improvement loans (the "Home Improvement Loans"). Dr. Edwards proposed that the form of the Home Improvement Loan documents follow those already in existence between CHFS and its then lender, Roy Al Finance.

John Allen ("Allen"), a disbarred attorney[9] and employee of CHFS, prepared the paperwork for the transaction, using as forms the documents in place between CHFS and Roy Al Finance, as suggested by Dr. Edwards. *Johnson*, 583 B.R. at 22. Allen prepared the Loan and Security Agreement (the "Credit Agreement"), and CHFS signed a Note dated September 25, 2006 (the "2006 Note"), obligating CHFS to pay the Rainbow Group the unpaid balance of all advances made under the $10 million line of credit.

Relevant to the present dispute, Allen also prepared the Custodial Agreement (the "Custodial Agreement") (Frascogna's Ex. 5) providing for the custody of the original Home Improvement Loan documents and assignments for the benefit of the Rainbow Group. The Custodial Agreement designated Harold B. McCarley, Jr. PLLC (the "McCarley Firm"), a law firm located in Ridgeland, Mississippi, as the custodian (the "Custodian") of the Home Improvement Loans.

---

[9] Allen was disbarred by the Mississippi Supreme Court on November 7, 2006.

### C.    2006 Due Diligence Trip

Dr. Edwards testified that he first met Frascogna as part of a due diligence trip to Jackson, Mississippi, on August 18, 2006 to observe CHFS's business operations at Dickson's Building and to meet with Dickson to discuss the loan proposal.  (Test. of Dr. Edwards at 9:27:20-9:27:42).  Frascogna is a Mississippi attorney in good-standing.[10]  The focus of his legal practice is consumer credit litigation.  Frascogna testified that at the end of 2006, he moved out of his previous law firm of nearly ten (10) years.  (Test. of Frascogna at 11:00:55-11:01:15).  He began working mostly from home but needed a conference room to meet with clients, and, in January of 2007, started renting office space in Dickson's Building.  (Test. of Frascogna at 11:01:00-11:01:11).

Dr. Edwards also testified he spoke with Frascogna on the first floor of Dickson's Building where "Mr. Frascogna had his desk" and that he had "not [spoken to Frascogna] since that day." (Test of Dr. Edwards at 9:28:15-9:28:30; 10:01:30-10:01:40).  Frascogna, however, did not begin renting office space in Dickson's Building until January of 2007 and had no recollection of ever meeting Dr. Edwards on August 18, 2006.  (Test. of Frascogna at 11:01:00-11:01:26).  Frascogna conceded that it was possible he "dropped in for a visit" to Dickson's Building on that date but reiterated that he did not occupy office space in Dickson's Building at that time.  (Test. of Frascogna at 11:01:10-11:01:26).

From time to time after Frascogna moved into Dickson's Building, Frascogna handled miscellaneous legal matters for Dickson individually.  (Test. of Frascogna at 11:01:28-11:02:46).  Dickson always paid Frascogna for his legal services.  (Test. of Frascogna at 11:03:35-11:03:42).  Frascogna never handled matters for CHFS.  (Test. of Frascogna at 11:02:44-11:02:50).

---

[10]    MISSISSIPPI  STATE  BAR  DIRECTORY,  https://www.msbar.org/lawyer-directory/?type=2&term=Frascogna (last visited Dec. 17, 2019).

### D.       Introduction of BHT

At some point, Dr. Edwards transferred the assets of the Rainbow Group to Beher Limited, a British Virgin Islands company that he purchased for that purpose, and the Rainbow Group assigned the 2006 Note to Beher Limited.  *Johnson*, 583 B.R. at 22-23.  Thereafter, on May 1, 2010, Dr. Edwards transferred the assets of Beher Limited to BHT, and Beher Limited assigned the 2006 Note to BHT.  At that time, the trustee of BHT was Church Bay Trust Co. ("Church Bay Trust"), a licensed Bermuda trust company, and Dr. Edwards was the U.S. investment advisor for BHT and the original settlor.  (Test. of Dr. Edwards at 10:04:38-10:04:50).  Dr. Edwards thus had no ownership interest in BHT.  (Test. of Dr. Edwards at 10:04:50-10:04:58).  Also in 2010, the Credit Agreement was amended to increase the line of credit from $12 million to $16 million and to divide the loan between BHT ($12 million) and another lender owned by Dr. Edwards.  Pursuant to the amended loan agreements, CHFS executed a $12 million Commercial Loan Note and Line of Credit in favor of BHT (the "BHT Note").

In 2008, before the parties entered into the amended loan agreements, Dickson approached Dr. Edwards about expanding the nature and scope of their business relationship to include a series of transactions where entities owned and/or purportedly controlled by Dr. Edwards would provide approximately $9 million for CHFS to purchase seven (7) mortgage portfolios of approximately 2,000 subprime loans (the "Mortgage Portfolios"), identified for ease of reference as "Portfolios #1-#7."  *Johnson*, 584 B.R. 26.  Although the purchases of the seven portfolios were funded directly by entities owned or purportedly controlled by Dr. Edwards, all of the portfolio purchase agreements were between CHFS and the portfolio seller.

E.      **Portfolio #7**

Portfolio #7 is the mortgage portfolio at issue in the Adversary Proceeding. On February 16, 2011, CHFS entered into an agreement with Blue World Pools, Inc. ("BWP") to purchase Portfolio #7 for approximately $6.5 million. BWP was engaged in the business of originating residential swimming pool loans secured by home mortgages. Between March of 2011 and June of 2011, an entity purportedly controlled by Dr. Edwards funded $5,777,754.00 to purchase Portfolio #7. Portfolio #7 consisted of approximately seven hundred (700) second mortgages (the "Loan Notes") with an original principal balance of approximately $10.6 million. On March 1, 2011, CHFS signed the Mortgage Portfolio Joint Venture Between Beher Holdings Trust & Community Home Financial Services, Inc. (the "MPF Agreement")[11] (BHT's Ex. 1) for the purchase of Portfolio #7 "in 4 roughly equal parts, with closings to occur on or about the first of March, April, May and June 2011." (Frascogna's Ex. 1). The MPF Agreement provided that "[t]he benefits and obligations of the Purchase Agreement have been assigned from CHFS to [BHT], and [BHT] will be the beneficial owner of the loans, subject to the terms of this Joint Venture."[12] (Frascogna's Ex. 1 at 1). Moreover, the MPF Agreement provided that "[t]he custodian selected by [BHT] will hold the original Notes and Assignments to [BHT] for all loans in the portfolio and will be entitled to physically retain the original notes until they are paid." Dickson and Dr. Edwards agreed that the original notes and assignments in Portfolio #7 would not

---

[11] On March 6, 2011, CHFS assigned the purchase agreement with BWP to Church Bay Trust, then the trustee of BHT. At some point, Church Bay Trust was replaced as the trustee of BHT by Nicholas Hoskins ("Hoskins"), and Ian Stone ("Stone") became the attorney for the new trustee of BHT. (Test. of Dr. Edwards at 9:32:40-9:32:46).

[12] The Court found that CHFS and BHT did not enter into a "joint venture" with respect to Portfolio #7 but that CHFS entered into a loan servicing contract with BHT and that BHT owned the Loan Notes. *See Johnson*, 583 B.R. at 96.

be held by BHT, Dr. Edwards, or CHFS but by a third-party custodian.  The cost of the fee paid to the custodian was to be equally divided between BHT and CHFS.  (Frascogna's Ex. 1).

## F.  Portfolio #7 Custodian

As late as March 2, 2011, BHT was still under the assumption that the McCarley Firm, who had previously worked with the Rainbow Group on the Home Improvement Loans, would serve as the custodian of the Loan Notes comprising Portfolio #7.  (BHT's Ex. 9).  In an email dated March 2, 2011, Dr. Edwards asked Dickson to provide "[c]onfirmation from Harold McCarley, Custodian, shortly after Closing, that he has received the BWP Notes and will be holding them in trust for [BHT]."  (BHT's Ex. 9).  Dr. Edwards suggested such confirmation from McCarley could be "a simplified version of the Oct 6, 2006 Certification he provided for The Rainbow Group."  (BHT's Ex. 9).  It was at this juncture, in 2011, that Frascogna became involved in the transaction through his friendship with Dickson.

### 1.  McCarley Firm's Custodial Agreement

The McCarley Firm's Custodial Agreement for the Home Improvement Loans was a twelve (12)-page document signed by Dickson on behalf of CHFS (the borrower), Dr. Edwards on behalf of the Rainbow Group (the lender), and Harold B. McCarley ("McCarley") on behalf of the McCarley Firm (the custodian).  (Frascogna's Ex. 5 at 12).  The Custodial Agreement contained twenty-one (21) defined terms and referenced at least six (6) exhibits.[13]  (Frascogna's Ex. 5 at 1-2).  "All capitalized terms used . . . and not otherwise defined [in the Custodial Agreement] shall have the meanings assigned in the Credit Agreement unless the context clearly indicates otherwise."  (Frascogna's Ex. 5 at 3).  Because Dr. Edwards testified that he believed Frascogna

---

[13] Frascogna did not offer the exhibits to the Custodial Agreement into evidence at the Trial.

was contractually obligated to duplicate the custodial duties of the McCarley Firm, the obligations set forth in the Custodial Agreement are discussed in detail below. But Frascogna never saw the McCarley Firm's contracts prior to CHFS's ongoing litigation beginning in 2012.

Under the Custodial Agreement, the McCarley Firm acted as the Custodian of the "Collateral and Collateral Documents." (Frascogna's Ex. 5 at 1). The Custodian of Documents was defined in Section 4.2 as:

> Custodian of Documents. Custodian, either directly or by acting through an agent, shall hold all documents relating to any Receivable that comes into its possession for the exclusive use and benefit of Lender. . . . Custodian shall segregate and maintain continuous custody of all such documents received by it in secure, fireproof facilities in accordance with customary standards for such custody and shall not release such documents or transfer such documents to any other party, including subcustodian, without the express written consent of the Lender[.]

(Frascogna's Ex. 5 at 6). The term "Receivable" was defined only by reference to the Credit Agreement. In addition to maintaining the documents in secure, fireproof facilities, the Custodial Agreement required the McCarley Firm, at its own expense, to maintain fidelity insurance and theft of documents insurance.[14] (Frascogna's Ex. 5 at 7). The Custodial Agreement provided detailed instructions for the McCarley Firm.

Under the main heading, "CUSTODIAL ARRANGEMENT," Section 3.2 discussed the transfer of the consumer mortgage documents from CHFS to the McCarley Firm. Before any newly acquired retail installment contract could become an "eligible receivable" under the Credit Agreement, the Custodial Agreement required CHFS to deliver to the McCarley Firm the retail installment contract, the consumer mortgage, and the assignment transferring the mortgage to the Rainbow Group.

---

[14] Frascogna did not maintain any of the additional fidelity insurance coverage or theft of documents insurance coverage. (Test. of Frascogna 11:28:00-11:28:09).

     (a)   <u>Delivery.</u>

        (i)   Borrower must (x) deliver to Lender and Custodian an electronic Custodial File Delivery Form, in the form attached hereto as Exhibit C (each a "<u>Custodial File Delivery Form</u>") and (y) deliver to Custodian the Consumer Mortgage Loan Files referred to on the schedule attached to such Custodial File Delivery Form not later than 10:00 a.m., Central Standard time, one (1) business days [*sic*] prior to the date a Custodial Certification (as defined below) is needed, all in accordance with the terms of the Credit Agreement.

        (ii)   Custodian shall, upon receiving such Custodial File Delivery Form and the related Consumer Mortgage Loan Files, promptly advise Lender and Borrower by e-mail or by facsimile transmission if it determines that items listed in Section 3.1 hereof with respect to such Consumer Mortgage Loan File are not so deposited.

(Frascogna's Ex. 5 at 4). Pursuant to the Custodial Agreement, the McCarley Firm agreed to certify and confirm each new retail installment contract and related documents delivered by CHFS, in return for payment of a $20.00 fee.

     (b)   <u>Certification.</u>

        Upon receipt by Custodian of the Custodian's Consumer Mortgage Loan Files from Borrower, Custodian shall, with respect to the Receivable applicable thereto, execute and deliver to Lender (with a copy to Borrower which shall be clearly marked as a copy and non-transferable) one or more certifications (each a "<u>Custodial Certification</u>"), in the form attached hereto as <u>Exhibit A</u> and in accordance with Section 3.3 hereof, on or before 1:00 p.m. Central Standard time one (1) business day prior to the funding date; provided, however, that if more than one hundred (100) Consumer Loan Files are delivered at one time to Custodian, a mutually agreed upon time period shall be allowed.

(Frascogna's Ex. 5 at 4).[15] As part of the "Certification" process required by Section 3.2(b), the Custodian:

     (a)   . . . shall, in each Custodial Certification, certify and confirm as to each Receivable on the schedule attached to the Custodial File Delivery Form, as applicable, that, except as noted on the schedule of exception report attached to the related Custodial File Delivery Form and Custodial Certification:

---

[15] The "Exhibit A: The Custodial Certification" (the "Exhibit A") was not attached to Frascogna's Exhibit 5.

> (i)     all documents required to be delivered to it pursuant to Section 3.1 hereof are in the Custodian's possession, except as otherwise noted in such exception report;
>
> (ii)    all documents contained in the Custodian's Consumer Mortgage Loan File have been reviewed by the Custodian and appear regular on their face and relate to such applicable Receivable and such documents do not contain any notations on their face; and
>
> (iii)   each of the documents described in Section 3.1(a)(1), with respect to each Receivable bears an original signature or signatures purporting to be the signature or signatures of the person or persons named as the maker or obligor thereunder and the assignor thereof[.]

(Frascogna's Ex. 5 at 4).

The Custodian could release the Consumer Mortgage Loan Files related to Receivables only upon "written request of Borrower, confirmed in writing by Lender." (Frascogna's Ex. 5 at 5). There was no provision in the Custodian Agreement for the McCarley Firm to release the documents to the Rainbow Group in the event of a default by CHFS. The Custodial Agreement also required the McCarley Firm to provide monthly Reports, as follows:

> Custodian agrees to deliver to Lender within ten (10) days after the end of each month, a report as of the end of such month, which provides the information set forth in Schedule A to the Custodial File Delivery Form for all Consumer Mortgage Loan Files in Custodian's custody as of the end of such month.

(Frascogna's Ex. 5 at 5).

In contrast to the dispute in the Adversary, the McCarley Firm had a complex agreement that set forth definite terms, obligations, and duties between the McCarley Firm and the Rainbow Group. The Custodial Agreement with the McCarley Firm was for a different transaction between different parties. Moreover, when the role of Custodian for Portfolio #7 was created, the McCarley Firm refused to conduct business with Dickson. To fill the vacancy, Dickson recommended Frascogna.

## 2.      Frascogna as "Custodian"

Dr. Edwards testified that Dickson recommended Frascogna, who he described as an attorney in Dickson's Building, to serve as the custodian for Portfolio #7.  (Test. of Dr. Edwards at 9:33:20-9:33:43).  Frascogna signed the first "Custodial Certification"[16] (BHT's Ex. 2) on March 28, 2011.  The evidence and testimony at the Trial suggested that the "Certification" referred to by Dr. Edwards in the March 2, 2011 email was the "Custodial Certification" attached as Exhibit A to the Custodial Agreement.  (Frascogna's Ex. 5; Test. of Dr. Edwards at 10:13:44-10:13:58).  Dr. Edwards's testimony, the March 2, 2011 email to Dickson, and the MPF Agreement confirmed that BHT required a designated Custodian for the Loan Notes before BHT would wire the funds.  (Test. of Dr. Edwards at 9:32:50-9:33:03, BHT's Ex. 9).  At some point between the March 2, 2011 email and another email dated March 29, 2011, McCarley, however, refused to act as Custodian for Portfolio #7, and the transaction required a new Custodian.  (*See* BHT's Ex. 9).

Dr. Edwards believed "[he] did have an idea" of what Dickson told Frascogna about his duties as custodian.  (Test. of Dr. Edwards at 10:08:00-10:08:11).  Dr. Edwards claimed Frascogna was to "duplicate the work of Mr. McCarley because Mr. McCarley was supposed to be the Custodian for this transaction."  (Test. of Dr. Edwards at 10:08:09-10:08:23).  Dr. Edwards, however, had no knowledge of the terms of any agreement Frascogna may or may not have had with any party.  Neither BHT nor Dr. Edwards produced any evidence of an actual agreement.

Dr. Edwards testified that BHT required confirmation that the new Custodian "was an attorney with malpractice insurance."  (Test. of Dr. Edwards at 9:33:07-9:33:12).  Dickson assured

---

[16] Frascogna signed a series of four "Custodial Certifications" dated March 28, 2011 (the "First Custodial Certification"); April 26, 2011 (the "Second Custodial Certification"); June 4, 2011 (the "Third Custodial Certification"); and July 13, 2011 (the "Fourth Custodial Certification") (collectively, the "Custodial Certifications").  (BHT's Ex. 2; Test. of Dr. Edwards at 10:08:53 10:09:00).

Dr. Edwards that Frascogna met the licensing and insurance requirements. (Test. of Dr. Edwards at 9:33:20-9:33:43). Dr. Edwards did not attempt to verify Dickson's assurances or speak directly to Frascogna. Dr. Edwards testified, "Mr. Frascogna presented the agreement . . . It was sent to [him] by Butch Dickson for [him] to forward for approval to Beher Holding's attorney." (Test. of Dr. Edwards at 10:05:08-10:05:24). Dr. Edwards further testified that Stone, counsel for BHT, "received the draft of the certificate" and then "the deal went forward." (Test. of Dr. Edwards at 9:33:20-9:33:43). Contemporaneous emails between Dickson and Dr. Edwards on March 29, 2011, however, suggest a different series of events:

-----Original Message-----
From: Butch Dickson <butch@chfsnet.com>
To: ccegse@aol.com
Sent: Tue, Mar 29, 2011 8:29 pm
Subject: RE: Beher wire amount

Dr. Edwards,

See Attached Custodial Certification.

Had Pat to prepare agreement if need at no charge.

I can send notes to you or Pat can hold them
till you call for them.

butch,

From: ccegse <ccegse@aol.com>
   To: butch <butch@chfsnet.com>; martha.a.edwards <martha.a.edwards@gmail.com>
Subject: Re: Beher wire amount
   Date: Tue, Mar 29, 2011 9:32 pm

Butch,

Thanks for the Certification. I forwarded to Bermuda.
Pat can hold them for now.
Does he hold a current MS license to practice law and maintain legal malpractice insurance?

On other subjects:
I sent the $51,660 due CHFS for loan servicing Nov - Jan.
CHFS Borrowing Base reporting is behind and funds need to be sent to BH & EFP from the lockbox at least bi-monthly.

         CCE

(BHT's Ex. 9). Dickson's contemporaneous emails demonstrate Dr. Edwards's was complacent about allowing Dickson to maintain control and possession of the Loan Notes when Dr. Edwards

did not have any of Frascogna's preliminary information before Frascogna signed the First Custodial Certification. The emails also undermined Dr. Edwards testimony regarding the vetting BHT required before Frascogna could be named as the custodian. Instead, the emails showed that the Custodial Certifications were provided by Dickson, not Frascogna, and that Dr. Edwards had not confirmed that Frascogna was a Mississippi attorney or insured prior to the First Custodial Certification. Dr. Edwards did not produce any later emails between Dickson and himself that answered his question, "Does he . . . maintain legal malpractice insurance?" (BHT's Ex. 9). Instead Dr. Edwards testified that Dickson confirmed Frascogna's license and insurance qualifications. If Dr. Edwards had investigated further, he would have learned that at the time Frascogna did not maintain any malpractice insurance. (Test. of Frascogna at 11:28:00-11:28:16). Though Dr. Edwards may have forgotten at the time of his email his alleged encounter with Frascogna five years earlier in Jackson, Mississippi, the emails indicate he had no knowledge of Frascogna's qualifications or professional standing as a licensed attorney.

Frascogna testified that in March of 2011, Dickson, who was operating a business out of a defunct country club in south Jackson, employed him only to "attest that each of th[e] [Loan] Notes had in fact been received." (Test. of Frascogna at 11:05:53-11:06:29). Frascogna understood that the Loan Notes belonged to Dickson and Dr. Edwards, and that Dickson needed Frascogna to certify that Dickson had received all of the Loan Notes. (Test. of Frascogna at 11:12:44-11:13:09). Frascogna agreed to attest to the receipt of the Loan Notes on four separate occasions. Each time Frascogna completed a Custodial Certification, Dickson paid Frascogna $500.00, for a total of $2,000.00, from an account owned by CHFS. (BHT's Ex. 2 at 17-21).

Frascogna received the First Custodial Certification from Allen on or about March 28, 2011.[17] (BHT's Ex. 3; Test. of Frascogna at 11:07:10-11:07:15). The Loan Notes were not delivered by a "secured third-party carrier" but given to Frascogna by Dickson. (Test. of Frascogna at 11:17:02-11:17:16). Frascogna testified his understanding of his employment with Dickson for this transaction was to "go through each batch . . . because there would be a stack . . . and [Frascogna] sat there and went through to make sure we had in fact received the [Loan] Notes that were being certified in the Custodial Certification." (Test. of Frascogna at 11:09:07-11:10:12). Frascogna checked off that the loan information provided on the accompanying spreadsheet matched the Loan Notes Dickson had provided to him. (Test. of Frascogna at 11:10:14-11:10:38). Frascogna performed the same task for the Loan Notes received for the Second Custodial Agreement, the Third Custodial Agreement, and the Fourth Custodial Agreement. Frascogna subsequently agreed with Dickson that the Loan Notes needed to be kept safe but that he, who at the time was renting office space in Dickson's Building, did not have anywhere to keep them. (Test. of Frascogna at 11:13:10-11:13:44). Dickson suggested keeping them in a locked filing cabinet in his office, and Frascogna helped orchestrate the storage of the Loan Notes in the locked

---

[17] Neither party produced or made significant issue of the "Custodial File Delivery Form.032511.docx" indicated as an attachment to Allen's email. (BHT's Ex. 3). Frascogna testified he did not recall receiving a document titled "Custodial File Delivery Form" and suggested it potentially referenced the spreadsheets attached to the Custodial Certifications. The Court notes that "Custodial File Delivery Form" is included in the production of documents Frascogna provided to the trustee in the bankruptcy case filed by CHFS in Case No. 12-01703-NPO (BHT's Ex. 2 at 14-15; 11:09:30-11:09:45). The Custodial File Delivery Form was only included with the Fourth Custodial Certification on July 13, 2011. (BHT's Ex. 2 at 14-15). The Custodial File Delivery Form referenced a number of undefined terms and an alleged agreement. Neither party has produced any documents to support the information in the Custodial File Delivery Form. Therefore, the Court notes the existence of the document but does not find it significant and the inclusion of the document does not impact its analysis.

cabinet with the receptionist shared by Frascogna and Dickson in Dickson's Building.  (Test. of Frascogna at 11:13:50-11:14:27).

BHT did not offer into evidence any agreement drafted by Frascogna or approved by BHT, and Dr. Edwards admitted that BHT and Frascogna did not enter into any written agreement beyond the Custodial Certifications.  (BHT's Ex. 2; Test. of Dr. Edwards at 10:08:53-10:09:00).  In fact, Dickson's March 29, 2011 email to Dr. Edwards indicated that Dickson *could* have Frascogna "prepare an agreement if need[ed]."  (BHT's Ex. 9).  There was no evidence that any such agreement was ever made, written or verbal.

The Custodial Agreement outlined the duties and responsibilities of the McCarley Firm as the Custodian of the Home Improvement Loans, but the Custodial Certifications signed by Frascogna did not contain any of the information in the Custodial Agreement.  (Test. of Dr. Edwards at 10:14:10-10:14:33).  The four (4) Custodial Certifications were identical except for certain details in paragraph (1) and (2) regarding the specific Loan Notes.  (BHT's Ex. 2).  The Custodial Certifications were in the form of a one-page memorandum or letter addressed to BHT and Stone.  The Custodial Certifications included approximately twenty (20) capitalized terms without any definition or explanation as to their meaning.  (BHT's Ex. 2).  Standing alone, the Custodial Certifications "confirm[ed] and certif[ied]" that Frascogna "received the original Retail Installment Contracts and Allonges to Promissory Note and/or Retail Installment Contract" for the Loan Notes included in each of the four transactions from BWP as identified in the "Custodian File Delivery Form."  (BHT's Exhibit 2).  The fourth paragraph of the Custodial Certifications waives any representations or warranties as to the "Custodian's Consumer Mortgage Loan File" or "any Receivable."  (BHT's Exhibit 2).  The final paragraph states, "Upon release of any Consumer Loan File, this Custodial Certification shall, as to the Consumer Loan File being

released, be and be deemed to be canceled by Custodian and of no force and effect."[18]  (BHT's

Exhibit 2).

 Dr. Edwards and Frascogna disagreed about the nature of the Custodial Certifications and

the scope of Frascogna's obligations as a custodian of the Loan Notes.  Dr. Edwards believed that

by signing the Custodial Certifications, Frascogna was obligated to act in the same way as the

McCarley Firm.  (Test. of Dr. Edwards at 10:18:40-10:19:00).  Dr. Edwards testified the "custodial

agreement obligations" of Frascogna were "to hold the [Loan Notes] in safe keeping for their

owner, Beher Holdings Trust.  That [was] his only obligation."  (Test. of Dr. Edwards at 10:23:44-

10:24:09).  Dr. Edwards further testified that the inherit rights, duties, and obligations of Frascogna

as a "custodian" created by the Custodial Certifications derived from common law.  (Test. of Dr.

Edwards at 10:26:45-10:27:24).  In fact, neither Dr. Edwards nor any representative from BHT

communicated with Frascogna about this transaction in 2011.  The only communication from

Frascogna to BHT consisted solely of the Custodial Certifications, which Dickson provided to Dr.

Edwards who in turn provided them to BHT.

 During this time, Frascogna was never contacted by Dr. Edwards or any representative

from BHT.  Had they contacted him, they would have learned that Frascogna did not hold errors

and omissions insurance or theft protection coverage.  (Test. of Frascogna at 11:28:02-11:28:30).

Dickson, and the accompanying documents provided by Allen, were the only source of information

or instruction received by Frascogna regarding his role in the Portfolio #7 transaction.  Although

the Custodial Certifications were addressed to "Beher Holdings Trust, Ian Stone, Trustee,

---

[18] At the Trial, counsel for BHT argued that Frascogna knew or should have known that the Loan Notes were "Consumer Loan File(s)" as used in the final paragraph of the Custodial Certifications.  Frascogna testified that the relationship did not occur to him at the time.  (Test. of Frascogna at 1:10:10-1:11:00).

Wakefield Quin Limited," Frascogna did not take issue with signing the Custodial Certifications provided by Allen because of the totality of the circumstances. Dickson's explanation and Frascogna's understanding of the Custodial Certifications was that his singular role was to certify receipt of the Loan Notes from BHT. (Test. of Frascogna at 1:08:50-1:09:25). From Frascogna's understanding, the use of the title "custodian" in the Custodial Certifications and the modest compensation for his services did not create any ongoing contractual or fiduciary obligation beyond certifying that Dickson, who gave the Loan Notes to Frascogna to certify in the first place, had custody of all of the Loan Notes listed on each spreadsheet from BHT. (Test. of Frascogna at 1:11:28-1:12:19). Without further communication from BHT or Dr. Edwards, Frascogna understood that signing the Custodial Certifications that named him as "Attorney and Custodian" was for the limited purpose of certifying that all the Loan Notes were received. (Test. of Frascogna at 1:11:55-1:12:29). As late as February 8, 2012 in an email exchange between Stone and Frascogna, Frascogna referred to Dickson as "my client" and made no reference to any duty, obligation, or responsibility to anyone besides Dickson. (BHT's Ex. 5).

During this time period, Frascogna testified he was unaware of the McCarley Firm's duties, had not seen any version of the Custodial Agreement or any of its exhibits except the Custodial Certification, and was not a party to any document with BHT, Dr. Edwards, Dickson, or CHFS about any sort of role as a custodian. (Test. of Frascogna at 11:29:00-11:29:15). Frascogna was also not aware that the Custodial Certifications were a one (1)-page component of a much larger agreement. The Custodial Agreement was for an entirely separate transaction for the Home Improvement Loans between different parties with different loan documents. The Rainbow Group contracted with the McCarley Firm. Frascogna never communicated with or was contacted by anyone from the McCarley Firm about this entirely separate arrangement. Indeed, Frascogna

received the drafts of the Custodial Certifications via email from Allen, not from Dr. Edwards or any other representative of BHT.  (BHT's Ex. 3).

Frascogna also testified that at the time he "wrote off" the peculiarity of the circumstances because Dickson and Dr. Edwards were friends and business partners.  (Test. of Frascogna at 11:32:55-11:33:03).  Frascogna understood the documents were valuable but never communicated with anyone other than Dickson regarding the Loan Notes, which he understood to belong to Dr. Edwards and Dickson as part of their business relationship.  Upon completion, Frascogna returned the Loan Notes to the person who gave the Loan Notes to him, Dickson.  Further deemphasizing the importance of Frascogna's understanding of his role with Portfolio #7 was the fact that he had not contracted with anyone but simply signed a document in letter form, and neither Dr. Edwards nor any other representative from BHT ever contacted him.  (Test. of Frascogna at 11:36:30-11:36:50).  Frascogna never provided monthly reports to BHT on the Loan Notes and did not have any further involvement with the Loan Notes until January of 2012.  (Test. of Frascogna at 1:20:15-1:21:00).

On November 2, 2011, Frascogna and his spouse commenced the Bankruptcy Case.  (Bankr. Dkt. 1).  They did not list BHT as a creditor in their bankruptcy schedules.  On March 7, 2012, they were granted a discharge of their pre-petition debts under 11 U.S.C. §727 (Bankr. Dkt. 29), and a Final Decree/Order Closing Case (Bankr. Dkt. 29-1) was entered that same day.

Until January of 2012, a representative from BHT never spoke with Frascogna.  During the relationship between Dr. Edwards and Dickson regarding Portfolio #7, Dickson communicated with Dr. Edwards and Frascogna separately.  (Test. of Frascogna at 11:05:37-11:05:54).  Often, the information passed from Dickson to Dr. Edwards and then to BHT, without any indication that Dickson had consulted Frascogna.  (Test. of Dr. Edwards at 10:07:20-10:07:28).  BHT and Dr.

Edwards unjustifiably relied on the representations Dickson made to them about Frascogna's duties and understanding of those duties.

At some point, Dickson moved the Loan Notes from the locked cabinet to a warehouse in Panama, the whereabouts of which remain unknown to this day.  Frascogna was not aware that Dickson had moved the Loan Notes or that Dr. Edwards and Dickson's relationship had "soured." (Test. of Frascogna at 1:21:00-1:21:03).  Frascogna also was unaware of the consequences for BHT and Dr. Edwards financial stake if the Loan Notes went missing, because he was not privy to any of the information surrounding Portfolio #7, he had not communicated with any representative from BHT or Dr. Edwards, and, since Dickson had custody of the Loan Notes from the beginning, he did not know there was an issue with his continued custody.  (Test. of Frascogna at 1:23:00-1:24:30).

On January 12, 2012, Stone, on behalf of BHT, sent Frascogna a letter requesting that Frascogna send the Loan Notes to BHT.  (Plaintiff's Exhibit 6).  This letter was the first communication from BHT to Frascogna about Portfolio #7.  (Test. of Dr. Edwards at 10:02:20-10:02:37; BHT's Ex. 4).

Frascogna testified, "It was not uncommon at all for someone to get ahold of me to ask questions like that . . . I was aware of these [Loan] Notes because, just a year before, [Dickson and I] had done what we did."  (Test. of Frascogna at 1:20:00-1:20:45).  When Frascogna received the letter from Stone asking for the return of the Loan Notes, his impression was, "[I]t's not like I wasn't going to ask Mr. Dickson first if we could do it—but it wasn't unusual. So, I said sure." (Test. of Frascogna at 1:20:00-1:20:45).  When Frascogna first contacted Dickson about Stone's request for the Loan Notes, Dickson continued to represent to Frascogna that he was collecting the Loan Notes to return to Stone.  (Test. of Frascogna at 1:21:50-1:21:56).

The relationship between Dr. Edwards and Dickson became more contentious on January 20, 2012, when Dr. Edwards sent a letter to CHFS demanding that CHFS cure certain defaults on the BHT Note by January 31, 2012, or face acceleration of the maturity date. *Johnson*, 583 B.R. at 31. CHFS made its last payment on the Mortgage Portfolios in February of 2012.

Frascogna made several attempts to obtain the Loan Notes from Dickson to return to Stone. Frascogna emailed Stone on January 25, 2012 that he was, "having the [Loan] Notes arranged for mailing and expect[ed] to get them out to [Stone] in the coming week." (BHT's Ex. 4). On February 8, 2012, Frascogna emailed Stone stating, "I am meeting with my client this week to go over the [Loan] Notes requested." (BHT's Ex. 4). Dickson, however, continued to delay return of the Loan Notes, and on February 13, 2012, Frascogna emailed Stone stating that he had met with Dickson and Dickson asked that Stone contact Dickson "without delay." (BHT's Ex. 5).

On February 21, 2012, Frascogna spoke to Stone on the telephone. (BHT's Ex. 5). Frascogna testified the exchange was not cordial and that Stone threatened Frascogna. (Test. of Frascogna at 1:22:12-1:22:45). The email following the telephone call was the first time BHT referred to Frascogna as "custodian on behalf of Beher Holdings Trust" and that there were "terms of the custodial agreement and the custodial file delivery forms issued." (BHT's Ex. 5). At the Trial, Dr. Edwards did not explain the "custodial agreement" or the "custodial file delivery forms" or provide any evidence as to BHT's understanding of Frascogna's role as a "custodian on behalf of Beher Holdings Trust" or the "terms of the custodial agreement." Moreover, Frascogna contends and this Court has found no indication that an agreement of any kind existed between BHT and Frascogna.

Knowing Dr. Edwards's litigious reputation, Dickson's "soured" feelings towards Dr. Edwards, and Stone's position per the February 21, 2012 telephone call, Frascogna testified he

tried to minimize his involvement and get the Loan Notes from Dickson to avoid getting "dragged into" the "middle of their war." (Test. of Frascogna at 1:22:12-1:22:45). Frascogna limited his communication with Stone and forwarded Stone's email demands to Dickson. (BHT's Ex. 5). On February 27, 2012, Frascogna emailed Stone to notify Stone that he "made a demand of Butch Dickson to return the requested Loan Notes to [Frascogna] by the close of business this Friday, March 2, 2012." (BHT's Ex. 5). Frascogna forwarded the email to Dickson. (BHT's Ex. 5). Frascogna memorialized a telephone conversation, by email, with Dickson on February 24, 2012 asking Dickson to "please make certain to return to me the [Loan] Notes requested by Mr. Stone by 5:00 p.m. next Friday, March 2, 2012." (BHT's Ex. 5). On March 2, 2012, Stone emailed Frascogna stating that "it is [Frascogna's] responsibility to retrieve the documents the subject of the custodial arrangements from Mr. Dickson." (BHT's Ex. 5). Frascogna forwarded Stone's email to Dickson. (BHT's Ex. 5). Stone did not attach any documentation or authority indicating the terms of the "custodial arrangements" that made Frascogna responsible for retrieving the Loan Notes from Dickson.

On February 15, 2012, CHFS and Dickson sued Dr. Edwards and BHT and others in state court, seeking a declaration of the parties' rights. *Johnson*, 583 B.R. at 31-32. Dr. Edwards and BHT removed the state lawsuit to the District Court in Case No. 3:12-cv-00252-CWR-LRA and asserted counterclaims against CHFS and Dickson. In May of 2012, the District Court conducted a trial, which was interrupted by the filing of a chapter 11 bankruptcy case by CHFS on May 23, 2012 (Case No. 12-01703-NPO) (the "CHFS Bankruptcy Case").

During the course of the CHFS Bankruptcy Case, CHFS generated substantial sums of money. For example, the October 2013 monthly operating report, the last one filed by CHFS as a DIP, showed an ending cash balance of $9,059,191.49. *Johnson*, 583 B.R. at 39. Beginning in

the fall of 2013, Dickson began transferring most of CHFS's cash to accounts in his name or in the names of affiliated companies. From November 5, 2013, to January 7, 2014, Dickson transferred approximately $9,095,000.00 from CHFS's account. In the fall of 2013, Dickson moved from Jackson, Mississippi to Costa Rica and set up a "rogue" operation of CHFS's business there and in Panama. The U.S. Trustee filed an emergency motion for the appointment of a chapter 11 trustee, which this Court granted on December 23, 2013.[19]

On March 10, 2014, a criminal complaint was filed against Dickson, alleging that Dickson "conspired to wire approximately $9,095,000.00 from accounts subject to bankruptcy protection to accounts [he] owned and/or controlled." (Case No. 3:14-CR-00078-TSL-FKB, Dkt. 1 at 4). Dickson was detained in Panama in federal custody and deported to the United States while *en route* to Costa Rica. Upon his return to the United States, Dickson was arrested for bank fraud and held without bond. On September 10, 2015, Dickson pled guilty to two counts of bankruptcy fraud in violation of 18 U.S.C. § 152(2) and (5) and was sentenced to serve fifty-seven (57) months in a federal correctional facility. *See United States v. Dickson*, Case No. 3:14-CR-00078-TSL-FKB, Dkt. 44.

Frascogna filed a Motion to Reopen (Bankr. Dkt. 32) the Bankruptcy Case on January 6, 2016, which the Court denied without prejudice. (Bankr. Dkt. 50). On February 5, 2018, Frascogna filed a second Motion to Reopen (Bankr. Dkt. 52) in the Bankruptcy Case, which the Court granted on July 17, 2018. (Bankr. Dkt. 75). On August 23, 2018, Frascogna and his spouse amended their bankruptcy schedules to add BHT as an unsecured creditor. (Bankr. Dkt. 77 at 7). BHT initiated the Adversary Proceeding by filing the Complaint on December 21, 2018.

---

[19] On May 23, 2012, the Bankruptcy Case was assigned originally to U.S. Bankruptcy Judge Edward Ellington. On February 1, 2017, the Bankruptcy Case and all related adversary proceedings were transferred to the above-signed Bankruptcy Judge. *Johnson*, 583 B.R. at 15 n.6.

In the Complaint, BHT alleged that Frascogna owed a contractual and fiduciary duty to BHT to hold the Loan Notes and that his negligent breach of his duties was the proximate cause of losses and damages sustained by BHT in the amount of $9,826.585.00. (Adv. Dkt. 1 at 4). BHT further alleged that the debt owed by Frascogna was nondischargeable[20] under either 11 U.S.C. § 523(a)(4) because his "actions constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" or 11 U.S.C. § 523(a)(6) because his actions "constitute willful and malicious injury to BHT." (Adv. Dkt. 1 at 4). Frascogna filed the Answer generally denying any liability to BHT on January 15, 2019. (Adv. Dkt. 7).

## Discussion

### I.      Establishing a Claim

BHT initiated the Adversary Proceeding before the question of Frascogna's liability had been adjudicated. A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt. Thus, before reaching the merits of the dischargeability issue, the Court must address the liquidation of BHT's claims for breach of contract and breach of a fiduciary duty. *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 478-80 (5th Cir. 2009). Whether Frascogna is liable to BHT requires an examination of state law. *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007); *see Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 492 B.R. 858, 887 (Bankr. S.D. Tex. 2013)

---

[20] The title and last unnumbered paragraph of the Complaint suggest that BHT also contends that Frascogna should be denied a discharge of all his debts in the Bankruptcy Case, but the body of the Complaint contains no supporting allegations. BHT's statement of the legal issues in the PTO fails to mention 11 U.S.C. § 727. (Dkt. 24 at 12). Because the PTO supersedes the Complaint and because it otherwise does not appear that BHT intended to pursue such a claim, the Court will not consider whether Frascogna should be denied a discharge pursuant to 11 U.S.C. § 727. FED. R. BANKR. P. 7016.

(finding that *Stern v. Marshall*, 564 U.S. 462, 479-80 (2011) left intact a bankruptcy court's authority to fully adjudge state-law claims in dischargeability actions).

### A.      Breach of Contract

BHT alleged that Frascogna breached his contractual duty to BHT by failing to maintain custody of the Loan Notes.  BHT's allegation requires the Court first to determine if an enforceable contract existed between Frascogna and BHT.

To determine if parties entered into a valid agreement, courts generally apply ordinary state-law principles governing the formation of contracts.  *Bowles v. OneMain Fin. Grp., L.L.C.*, 927 F.3d 878, 882 (5th Cir. 2019) (citations omitted).  In Mississippi, "[t]he elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation."  *Bowles,* 927 F.3d at 882.  Contract formation is based on an objective manifestation of intent to form a contract and is not based on one party's subjective intent.  Whether a contract is ambiguous is a question of law for the Court to determine, and if it is not, the contract should be enforced as written.  *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (Miss. 2003).  If the contract is ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent."  *Id.* at 752-53 (internal citations and quotations omitted).

Finding evidence of any contractual relationship between BHT and Frascogna is difficult. There was no written agreement signed by both parties.  There was no meaningful communication between the parties before January 2012.  The testimony of Dr. Edwards and Frascogna presented contrasting narratives of the same series of events.  The Custodial Certifications were the only documents that both parties acknowledged form part of the transaction involving Portfolio #7.

Therefore, the Court begins its analysis by looking to the "four corners" of the Custodial Certifications. *Chandeleur Homes, Inc.*, 857 So. 2d at 752.

As noted previously, the Custodial Certifications were a series of four letters or memoranda drafted by Allen, addressed to Stone as trustee for BHT, and signed by Frascogna as "Custodian." The Custodial Certifications included approximately twenty (20) capitalized terms without corresponding definitions. The Custodial Certifications "confirm[ed] and certif[ied]" that Frascogna "received the original Retail Installment Contracts and Allonges to Promissory Note and/or Retail Installment Contract." The final paragraph stated, "Upon release of any Consumer Loan File, this Custodial Certification shall, as to the Consumer Loan File being released, be and be deemed to be canceled by Custodian and of no force and effect." The Custodial Certifications did not indicate when the "Consumer Loan File" should or should not be released or to whom. Without definitions of any of the capitalized terms, the only sufficiently definite term in the Custodial Certifications was Frascogna's receipt of the Loan Notes. The Custodial Certifications did not indicate the duration of the relationship or any other duties, obligations, or expectations regarding the Loan Notes. The indefinite terms in the Custodial Certifications and the absence of a glossary defining these terms render the Custodial Certifications ambiguous.

When a contract is ambiguous, the court may go beyond the text of the document to determine the parties' true intent. *Chandeleur Homes, Inc.*, 857 So. 2d at 752-53. At the Trial, Rawlings's cross-examination of  Frascogna attempted to have Frascogna admit that "Consumer Loan File(s)," as used in the final paragraph of the Custodial Certifications, were the Loan Notes. The final paragraph stated, "Upon release of any Consumer Loan File, this Custodial Certification shall, as to the Consumer Loan File being released, be and be deemed to be canceled by Custodian and of no force and effect." Standing alone, the Custodial Certification does not indicate to whom

or at what time the "Consumer Loan File" should or should not be released. If the Court accepts BHT's interpretation, then releasing the Loan Notes to anyone, including Dickson, also released the "Custodian" and canceled the force and effect of the Custodial Certifications. The evidence of the parties' intent and understanding beyond the almost meaningless Custodial Certifications fails to establish a contractual relationship between Frascogna and BHT. Moreover, the arguments and evidence BHT presented at Trial on the "Consumer Loan File(s)" indicates, standing alone, that releasing the "Consumer Loan File(s)" to anyone released the "Custodian."

The evidence to establish Frascogna and BHT as the "parties" of any agreement was not convincing. Frascogna testified that to his knowledge and understanding, he had not contracted with anyone but simply signed a letter addressed to Stone and BHT. In the absence of a written agreement, action and conduct can evidence a contractual relationship. However, neither Dr. Edwards nor a representative from BHT ever contacted Frascogna until January of 2012. By remaining silent, BHT did not conduct itself as though there were an ongoing contractual relationship with Frascogna, and Frascogna reasonably did not understand there to be one.

Further evidencing the lack of any intent to contract with BHT was the payment for the services rendered by Frascogna. The MPF Agreement between Dickson and BHT divided the custodian fee between BHT and CHFS. However, Dickson paid Frascogna $250.00 for each hour he spent on the Custodial Certifications for a total of $2,000.00. Neither Dickson nor BHT continued to pay Frascogna for any services related to Portfolio #7 after he signed the Fourth Custodian Certification on July 3, 2011. Additionally, Frascogna, as late as February 8, 2012 in an email, understood that Dickson was his client, not BHT. The email on February 21, 2012, following Frascogna's telephone conversation with Stone, was the first time BHT refers to Frascogna as "custodian on behalf of Beher Holdings Trust" or to the "terms of the custodial

agreement and the custodial file delivery forms issued." The evidence suggests that Frascogna had an attorney-client relationship with Dickson, and that Frascogna was paid for his legal services by Dickson. BHT's claim of a contractual relationship with Frascogna is unsupported by the evidence.

The Court finds that in the absence of evidence of any mutual assent between Frascogna and BHT, there was no evidence of any objective manifestation of an intent to contract. Parties to a contract must come to an agreement on the essential elements of the contract. *King Metal Bldgs., Inc. v. Renasant Ins., Inc.*, 159 So. 3d 567, 573-74 (Miss Ct. App. 2014). Mutual assent is described as the "meeting of the minds" and is often evidenced by a written agreement signed by all parties. *Wilkinson Cty. Senior Care, LLC v. Kirkland*, 196 So. 3d 1143, 1149 (Miss. Ct. App. 2016). Mutual assent can also be evidenced through the actions and conduct of the parties. *Id.* The parties must have a meeting of the minds on the essential elements of the contract, especially when created without a written agreement.

As the testimony of Dr. Edwards on behalf of BHT and the testimony of Frascogna demonstrated, the unilateral negotiations through Dickson eliminated mutual assent between the two parties. Frascogna received the Custodial Certifications, confirmed that the information on the Loan Notes that Dickson gave him corresponded with the entries on the spreadsheet, signed the Custodial Certifications, and received payment for his services from Dickson. Dr. Edwards believed that by signing the Custodial Certifications, Frascogna would act as a "Custodian" in the same manner as the McCarley Firm. Dr. Edwards, however, also testified that the only "custodial agreement obligations" of Frascogna were "to hold the [Loan Notes] in safe keeping for their owner, Beher Holdings Trust." Even Dr. Edwards's testimony indicated BHT was unsure of the scope of Frascogna's "contractual" obligations. A contract is unenforceable if the material terms

are not sufficiently definite. *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003). The Court finds that a contractual relationship, and any subsequent contractual duty, between BHT and Frascogna did not exist.[21]

### B.    Breach of Fiduciary Duty

The Court next considers whether a fiduciary relationship existed between Frascogna and BHT in the absence of a contractual relationship. In Mississippi, fiduciary relationships can arise in a variety of contexts. "Traditional fiduciary relationships are found in cases of trustee and beneficiary, partners, principal and agents, guardian and ward, managing directors and corporation." *Robley v. Blue Cross/Blue Shield of Miss.*, 935 So. 2d 990, 994 (Miss. 2006) (citation omitted). Mississippi also recognizes informal fiduciary relationships "in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependency or trust, justifiably reposed." *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79, 83 (Miss. 1991) (quotations omitted). "Fiduciary relationships often turn on questions of fact related to exertion of influence, whether a party trusted and relied on another party, and whether the reliance was justified." *Gibson v. Williams, Williams & Montgomery, P.A.*, 186 So. 3d 836, 852 (Miss. 2016).

---

[21] The parties did not raise the argument that BHT was a third-party beneficiary of a contractual relationship between Frascogna and Dickson. In reviewing the cases, litigants have raised the question of a fiduciary duty owed to a third-party beneficiary. Mississippi law requires: (1) the contract between the original parties must have been entered for the benefit of the third party; or (2) such benefit is the direct result of the performance within the contemplation of the parties as shown by its terms. *Garrett Enters. Consol., Inc. v. Allen Utils., LLC*, 176 So. 3d 800, 804-05 (Miss. Ct. App. 2015) (internal citations & quotations omitted). Since the parties did not raise this issue, the Court does not consider the issue, particularly because, BHT, if anything, was an incidental beneficiary and has no right to seek the enforcement of the terms of a contractual relationship between other individuals or claim a fiduciary obligation. *Garrett*, 176 So. 3d at 805.

The Court finds that BHT has not produced evidence to establish a valid, justifiable fiduciary relationship with Frascogna. Frascogna did not exert any influence over BHT. Before January of 2012, Frascogna had no contact with BHT. Frascogna received the Custodial Certifications from Allen, he verified the information with the Loan Notes that Dickson provided to him, he returned the Loan Notes and Custodial Certifications to Dickson, Dickson sent the Custodial Certifications to Dr. Edwards, and, it can be inferred that Dr. Edwards forwarded the Custodial Certifications to BHT. (BHT's Ex. 9). As the Court already has found, the Custodial Certifications only certified Frascogna's receipt of the Loan Notes. BHT did not rely on any other representations by Frascogna because he made none. Instead, it appears that Dr. Edwards and BHT relied on Dickson's representations regarding the custodial arrangement with regard to the Loan Notes. The Court rejects BHT's argument that the Custodial Certifications charged Frascogna with the same obligations and duties as the twelve (12)-page Custodial Agreement, supplemented by at least six exhibits, charged the McCarley Firm. The Custodial Agreement was from a different transaction. Frascogna was never contacted by the McCarley Firm. BHT never instructed Frascogna to collaborate with the McCarley Firm. Frascogna never received a copy of the Custodial Agreement. BHT's understanding that Frascogna would perform tasks beyond certifying receipt of the Loan Notes because of BHT's understanding of their previous arrangement with the McCarley Firm was unreasonable and unjustified. Frascogna made no representations to BHT that he would keep the Loan Notes in a safe location, maintain custody of the Loan Notes indefinitely, procure insurance, or keep them away from Dickson.

BHT also contended that Frascogna owed a fiduciary duty established by the Mississippi Rules of Professional Conduct (the "Rules")—specifically, Rule 1.15. The official comment to Rule 1.15 provides that "[a] lawyer should hold property of others with the care required of a

professional fiduciary." MISS. RULES OF PROF'L CONDUCT r. 1.15 (Miss. Bar Ass'n).  The official

comment also states that "[t]he obligations of a lawyer under this Rule are independent of those

arising from activity other than rendering legal services."  *Id.*  Here, Frascogna was acting as an

attorney to Dickson.  As the Court has found, Frascogna did not breach a fiduciary duty in

performing the services he was hired by Dickson to perform.  In *Pierce v. Cook*, 992 So. 2d 612

(Miss. 2008), the Mississippi Supreme Court held that the "[v]iolation of a Rule of Professional

Conduct does not give rise to a cause of action nor does it create a presumption that a legal duty

has been breached." *Id.* at 625-26.  The Rules are not designed to create a basis for civil liability

but to provide guidance to lawyers.  *Id.*  The Court does not find any evidence that supports a

holding that Frascogna violated his fiduciary obligation to BHT because of the services he

rendered as counsel for Dickson in this transaction.  The Rules do not create a fiduciary

relationship between BHT and Frascogna.

The Court has found no evidence of a fiduciary relationship between BHT and Frascogna.

Based on the evidence presented at the Trial, Dickson engaged Frascogna for the limited purpose

of confirming and certifying receipt of the Loan Notes in each installment.  Dickson and Allen

provided Frascogna with the Loan Notes and Custodial Certifications that confirmed the presence

of the Loan Notes.  Frascogna was compensated for his time and returned the Loan Notes to

Dickson.  The evidence presented at Trial does not support any ongoing obligation of Frascogna

to BHT or a breach of any fiduciary duty.

### C.      Dischargeability & Other Issues

In resolving the issues put forth by the parties for Trial, the Court finds that: (1) Frascogna

did not breach a contract or breach a fiduciary duty entitling BHT to damages in the amount of

$9,826,585.00; (2) whether BHT properly designated Dr. Edwards as an expert in damages is

unnecessary to address because the Court finds no basis for BHT's claim against Frascogna; (3) whether BHT's cause of action against Frascogna accrued after November 2, 2011, the date of Frascogna's bankruptcy filing, is unnecessary to address as well for the same reason; (4) whether the actions of Frascogna constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny so as to except from discharge any debt owed to BHT pursuant to 11 U.S.C. § 523(a)(4) is unnecessary to address because the Court finds BHT has no claim for breach of contract or breach of a fiduciary duty; and (5) whether the actions of Frascogna constitute willful and malicious injury to BHT so as to except from discharge any debt owed to BHT pursuant to 11 U.S.C. § 523(a)(6) is unnecessary to address as well for the same reason.  (PTO at 12).

## Conclusion

Based on the foregoing, the Court concludes that BHT did not meet its burden to prove an underlying claim against Frascogna.  BHT did not establish an existing contractual or fiduciary relationship between BHT and Frascogna.  As a result, the Complaint should be dismissed with prejudice.  A separate final judgment on the Adversary Complaint will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

## END OF OPINION ##